**United States District Court**
For the Northern District of California

1
2
3
4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   CSL, L.L.C.,                                    No. C-03-5566 JCS

8               Plaintiff(s),

                                            **ORDER DENYING MOTION FOR**
9        v.                                 **FINDING OF CONTEMPT**
                                            **[Docket No. 115]**
10  IMPERIAL BUILDING PRODUCTS, INC.,
    ET AL.,
11
                Defendant(s).
12  _____/

13  **I.      INTRODUCTION**

14          Plaintiff, CSL, L.L.C. ("CSL"), brings a Motion (the "Motion"), asking that the Court find

15  Defendants Imperial Building Products, Inc. and Imperial Brush Co., Ltd. (collectively referred to as

16  "Imperial") in contempt of this Court's Final Judgment and Injunction entered on April 30, 2004, and

17  asking the Court to impose contempt sanctions.  CSL asserts that Defendants have violated this Court's

18  order by: (1) using the SUPERSWEEP trademark on the fire log products that are not capable of removing

19  or reducing chimney creosote; and (2) making certain false representations in connection with the marketing

20  of their fire log products.  CSL's Motion was referred to the undersigned, and the parties consented to

21  Magistrate jurisdiction pursuant to 28 U.S.C. § 636(c).  A hearing was held on February 11, 2005.  For

22  the reasons stated below, the Motion is DENIED.[1]

23          CSL and Imperial each tested the product at issue: Imperial's SUPERSWEEP Plus fire log.  While

24  these tests reached opposite conclusions about the product, none of the tests presented scientifically reliable

25  conclusions under Fed. R. Civ. P. 702 ("Rule 702") and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S.

26  _____

27          [1]   The Court delayed deciding the Motion, and issuance of this opinion because the parties'
    correspondence after the hearing indicated that they were working on an agreed-upon procedure to resolve
28  the matter.  It now appears to the Court that those efforts have not born fruit.

**United States District Court**
For the Northern District of California

579 (1993).  However, such evidence is not required with respect to Paragraph 2 of the injunction forbidding the sale of a SUPERSWEEP log unless the product has the "demonstrated capability" to remove creosote in chimneys.  The Court concludes that CSL has not proven by clear and convincing evidence that Imperial's testing does not demonstrate such a capability.

Nor has CSL demonstrated by clear and convincing evidence that Imperial has falsely made statements in violation of Paragraph 1 of the injunction.  CSL has not presented reliable scientific proof necessary to show that the SUPERSWEEP Plus log does not have the claimed attributes.  To meet such a high standard – proving falsity by clear and convincing evidence – evidence that is reliable under Rule 702 and *Daubert* is required, and has not been provided.  Moreover, were the Court to ignore the requirements of Rule 702 and consider CSL's evidence, the conclusion would not change: CSL has not proven by clear and convincing evidence that Imperial made false statements in violation of Paragraph 2 of the Injunction.

## II.     BACKGROUND

### A.     Procedural History

In 2004, CSL brought an action in this Court against Imperial for false advertising, and sought a preliminary injunction prohibiting Imperial from continuing to market its SUPERSWEEP Chimney Cleaning Log (the "original SUPERSWEEP log").  Although a preliminary injunction was not issued, the parties entered into a settlement agreement, the terms of which prohibit Imperial from making certain representations in connection with the marketing of its fire logs.  The settlement agreement was signed by the Court and became the Final Order and Injunction of April 30, 2004 (the "Injunction").

The Injunction prohibits Imperial from "falsely representing that any artificial log product offered in the future in the United States (the 'Future Fire Log Product'):

     (a)     helps eliminate dangerous creosote in a chimney;

     (b)     helps prevent chimney fires;

     (c)     contains powdered combustion catalysts;

     (d)     aids in the loosening and breaking away of hard, scaly or glazed creosote deposits;

     (e)     lowers the combustion point of the creosote and soot deposits in a chimney flue by up to 500°F; or

United States District Court

For the Northern District of California

1    (f)    is a chimney cleaning log."

2    Injunction at ¶1.  In addition, the Injunction enjoins Imperial from using the "SUPERSWEEP" mark on any

3    "Future Fire Log Product, unless such Future Fire Log Product has the demonstrated capability to remove

4    creosote in chimneys and/or aid in the loosening and breaking away of creosote deposits."  *Id.* at ¶2.

5    In May of 2004, CSL brought a motion for contempt ("the First Motion for Contempt"), alleging

6    that Imperial had violated the Injunction by displaying promotional materials regarding its original

7    SUPERSWEEP log at a trade show.  Based on the record of the First Motion for Contempt, this Court

8    found for CSL and ordered Imperial to pay CSL's attorneys' fees.  *See* Order, filed July 19, 2004 ("the

9    July 19, 2004 Order").

10   Since the July 19, 2004 Order was issued, Imperial has started to market a new log, the

11   SUPERSWEEP Plus, which it asserts is an improved formulation of the original log.  The SUPERSWEEP

12   Plus log's packaging bears representations which, if false, would be prohibited by the Injunction.  See

13   Injunction at ¶1.  In addition, the packaging bears the SUPERSWEEP mark, which is prohibited by the

14   Injunction unless Imperial can demonstrate that the log is capable of removing, reducing, or loosening

15   chimney creosote.  *See* Injunction at ¶2.  On September 1, 2004, Imperial sent a letter to the Court

16   indicating its intent to market the SUPERSWEEP Plus log.  The letter further indicated that, in order to

17   comply with the Injunction, Imperial had performed tests on the SUPERSWEEP Plus log and that the tests

18   demonstrated that it reduces creosote in chimneys.

19   In response, CSL requested Imperial's test results in order to verify that Imperial was, in fact,

20   complying with the Injunction.  When Imperial refused to provide the test results, CSL hired an independent

21   lab to conduct tests on Imperial's SUPERSWEEP Plus log.  Because CSL's tests allegedly prove that the

22   SUPERSWEEP Plus log does not reduce creosote in chimneys, CSL filed the present Motion.

23   **B.    Controlling Chimney Creosote**

24   Creosote (also known as "soot") is created by the incomplete combustion of organic compounds

25   present in fuel sources such as wood and coal.  *See* Declaration of Abraham Kelly in Support of

26   Defendants' Opposition to CSL, L.L.C.'s Motion for Finding of Contempt, filed December 10, 2004

27   ("Kelly Decl.") at ¶15; Plaintiff CSL, L.L.C.'s Notice of Motion and Motion for Finding of Contempt;

28   Memorandum of Points and Authorities in Support Thereof, filed December 10, 2004 ("CSL Motion") at

United States District Court

For the Northern District of California

2.  During the course of burning a wood fire, partially combusted organic compounds become airborne, rise up into the chimney flue, and coalesce on the sides of the chimney to form creosote.  Kelly Decl. at ¶16. Because creosote deposits consist of partially combusted organic material, they can reignite if heated sufficiently.  Reply Declaration of James E. Houck, Ph.D., in Support of Plaintiff CSL's Motion for Finding of Contempt, filed December 10, 2004 ("Houck Reply Decl.") at ¶5.  When creosote deposits become large enough, they pose a safety threat because they can reignite to cause a dangerous chimney fire.  *Id.* at ¶12.  Each year, many residences in the United States are damaged or destroyed by the spread of out-of-control chimney fires.  CSL Motion at 2 (*citing* to the Houck Preliminary Injunction Declaration).

By reducing the amount of creosote in a chimney, it is possible to reduce the risk of chimney fires. Kelly Decl. at ¶17.  One means of reducing creosote build-up in a chimney is to have the chimney swept by a chimney sweep.  *See* Declaration of James E. Houck, Ph.D., in Support of Plaintiff CSL, L.L.C.'s Motion for Finding of Contempt, filed December 10, 2004 ("Houck Decl.") at ¶34.  Alternative methods also exist, though.  These alternative methods typically involve the addition of chemicals catalysts to a fire. Kelly Decl. at ¶19.  Once the chemical catalysts are sufficiently heated so as to become volatile, they are able to contact creosote attached to the inside of the chimney, and act to reduce the temperature at which creosote burns.  *Id.* at ¶¶ 19-20.  As the creosote burns, its mass is reduced, and any remaining creosote tends to have a brittle structure that either flakes off the chimney or can be more readily scraped off.  *Id.* at ¶19.

C.      **Imperial's SUPERSWEEP Plus Log**

1.      **Composition of the SUPERSWEEP Plus log**

Plaintiff CSL and Defendants Imperial each market a fire log product which incorporates chemical catalysts designed to remove or reduce built-up chimney creosote deposits.  Imperial's SUPERSWEEP Plus log includes as the chemical catalysts 5% sodium chloride (table salt), 0.08% sulfate, 0.1% calcium, 0.07% copper, 0.02% iron, and 0.06% zinc.  Houck Reply Decl. at ¶34 & Table 4.  According to Imperial, the use of metallic chlorides, such as sodium chloride, zinc chloride, iron chloride, and copper chloride, to catalyze the burning of creosote and its concomitant reduction in chimneys has been well documented.  Defendants' Opposition to CSL, L.L.C.'s Motion for Finding of Contempt, filed December

United States District Court

For the Northern District of California

10, 2004 ("Imperial Opposition") at 1; Kelly Decl. at ¶¶ 20-24.  Imperial cites five references in support of this contention:

1)  "Bulletin 360," published by the Department of Commerce in 1932, which describes the use of metallic salts, and in particular metallic chlorides such as sodium chloride, zinc chloride, and copper chloride, to eliminate chimney creosote;

2)  a book entitled <u>All About Chimneys - Building, Using, Maintaining & Repairing</u>, by John E. Traister (the "Traister book"), which describes the use of sodium chloride and zinc to reduce the accumulation of creosote in chimneys;

3)  a scientific paper, "Fuel Additives and Applications," by Bruce T. Ketrick (the "Ketrick publication"), which states that sodium, copper, and iron act as combustion catalysts for creosote;

4)  another scientific paper, "Catalytic combustion of soot on metal oxides and their supported metal chlorides," by Shaobin Wang and Brian S. Haynes (the "Wang publication"), which discusses the catalytic effect of metallic chlorides on soot; and

5)  U.S. Patent No. 5,882,365 (the "'365 patent"), which is owned by CSL and directed to the composition of fire logs that are capable of reducing built-up creosote in the chimneys of wood stoves.

### 2.    Imperial's marketing of the SUPWERSWEEP Plus log

Imperial markets its SUPERSWEEP Plus log in packaging that (1) displays the SUPERSWEEP mark and (2) makes various claims about the uses and efficacy of the log.  Declaration of Marc M. Gorelnik in Support of Plaintiff CSL, L.L.C.'s Motion for Finding of Contempt ("Gorelnik Decl.") at ¶5 & Exh. D.  In particular, the packaging states that the SUPERSWEEP Plus log:

(a)  "[h]elps reduce dangerous creosote in your chimney";

(b)  "reduces [the] risk of chimney fires";

(c)  contains "chemical compounds that act as combustion catalysts"; and

(d)  is "a chimney cleaning log."

The packaging further states that:

(e)     "the combustion catalysts help facilitate the burning of creosote and soot which can build up in chimneys"; and that

(f)     "[t]hese catalysts can also help weaken, loosen, and break away some of the hard, scaly, or glazed deposits that may be difficult to remove by chimney brushing alone."

*Id.*

### 3.     Imperial's evidence concerning the efficacy of the SUPERSWEEP Plus log

To comply with the Injunction, Imperial conducted tests on the SUPERSWEEP Plus logs prior to marketing them to determine whether the logs could, in fact, reduce chimney creosote. Declaration of Rick Nowlan in Support of Defendants' Opposition to CSL, L.L.C.'s Motion for Finding of Contempt ("Nowlan Decl.") at ¶2. During the summer of 2004, Imperial conducted two sets of tests[2]: "Test 1" occurred in August of 2004, and "Test 2" occurred at some later, unspecified time. *Id.*; Kelly Decl. at ¶¶ 33-41. Imperial's test protocol was based upon that used by CSL's expert, Dr. Houck, when he conducted tests on the original SUPERSWEEP log. Nowlan Decl. at ¶4 & Exh. A. In each set of tests, chimney creosote was accumulated in two test stoves and two control stoves by burning a series of wood fires. *Id.*; Kelly Decl. at ¶34. After accumulating creosote, the efficacy of the SUPERSWEEP Plus log was tested by first building up a "hot" fire in each of the stoves. *Id.* at ¶35. Once the fires were hot, a single SUPERSWEEP Plus log was introduced into each of the test stoves and burned to completion, while wood of equal weight was introduced into each of the control stoves and burned to completion. *Id.* The gain or loss of creosote resulting from the test/control fires was then determined by calculating the difference between the weight of each stoves' chimney before and after the burning of the test/control fires. *Id.* According to Imperial, a key aspect of its testing methodology is that the "hot" test/control fires were

---

[2]     There was, in fact, an earlier set of tests that occurred in July of 2004, but at that time Imperial was testing three different potential formulations of the SUPERSWEEP Plus log and there is no indication in the record which formulation, if any, was ultimately marketed. *See* Imperial Opposition at 8; Kelly Decl. at 35. Furthermore, because a mechanical failure resulted in the loss of temperature data for the control stove, Imperial felt that additional tests were necessary. *Id.* Nevertheless, Imperial claims that the July test data shows that the SUPERSWEEP Plus log reduces chimney creosote to a greater extent than a wood fire alone. *Id.*

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  burned at temperatures of over 350°F, as determined by using an external surface thermometer located 18"

2  above the chimney's base. *Id.* at ¶43; Imperial Opposition at 6 & n.5.[3]

3       Imperial's Test 1 results were obtained using stoves that had either a stainless steel chimney or a

4  black matte chimney. Kelly Decl. at ¶36 & Table 1. The results of Test 1 were as follows:

| Stove[4] | Creosote Before Test (g) | Creosote After Test (g) | % Reduction |
|---|---|---|---|
| SS, control | 1640 | 760 | 54% |
| SS, SSP test | 2220 | 620 | 72% |
| BM, control | 2220 | 440 | 80% |
| BM, SSP test | 3180 | 280 | 91% |

10  *Id.* at ¶¶ 36-37 & Table 1. According to Imperial, the results of this test show that the SUPERSWEEP

11  Plus log removed 26% more creosote from stainless steel chimneys and 12% more creosote from black

12  matte chimneys than burning a hot fire alone. Imperial Opposition at 8.

13       Imperial's Test 2 differed slightly from Test 1 in that all of the stoves were equipped with black

14  matte chimneys. Kelly Decl. at ¶ 39 & Table 2. In addition, at the February 11, 2005, hearing Imperial

15  stated that the Test 2 fires were maintained at lower temperatures than the Test 1 fires. The results of Test

16  2 were as follows:

| Stove | Creosote Before Test (g) | Creosote After Test (g) | % Creosote Change |
|---|---|---|---|
| Control (A) | 1220 | 1360 | +11% |
| SSP Test (A) | 1260 | 800 | -37% |
| Control (B) | 440 | 800 | +82% |
| SSP Test (B) | 620 | 320 | -48% |

---

[3]  Imperial's test protocol deviates from Dr. Houck's in two important respects. First, Imperial's test/control fires were burned at hotter temperatures than the fires used to build up creosote, whereas CSL burned the test/control fires at the same temperature as the fires used to build up creosote. Second, Imperial measured the creosote weight gain or loss of the chimneys soon after the test/control fires, without burning any additional fires in the stove prior to making said measurements. In contrast, CSL burned a supplemental fire in the chimneys in between the time of the test/control fires and the measurement of the creosote weight gain or loss in the chimneys. *See* Imperial Opposition at 6; Nowlan Decl. at Appendix A, page 3; Houck Reply Decl. at ¶8.

[4]  SS, stainless steel; BM, black matte; SSP, SUPERSWEEP Plus log.

**United States District Court**

For the Northern District of California

1    Kelly Decl. at ¶39 & Table 2.  Imperial argued at the hearing that, by using lower fire temperatures in Test

2    2, it was able to identify conditions where creosote accumulates in the control stoves but decreases in the

3    test stoves.   According to Imperial, the Test 2 data "clearly demonstrate" that the SUPERSWEEP Plus log

4    removes more creosote than burning a wood fire alone.  Imperial Opposition at 10-11.

5         **D.    Plaintiff's Claims**

6         Plaintiff CSL claims that Imperial is in violation of the Injunction because the SUPERSWEEP Plus

7    log:

8         (a)    does *not* reduce dangerous creosote;

9         (b)    does *not* reduce the risk of chimney fires, since it does not reduce the amount

10                of creosote present in chimneys;

11        (c)    does *not* contain combustion catalysts which help facilitate the burning of

12                creosote and soot which can build up in chimneys, since chimney creosote

13                accumulation increased during testing;

14        (d)    does *not* contain chemical compounds that act as combustion catalysts;

15        (e)    does *not* facilitate the burning or removal of creosote and/or soot nor does it

16                help to weaken, loosen, and/or break away hard, scaly or glazed deposits

17                that may be difficult to remove by chimney brushing alone; and

18        (f)    does *not* act as a chimney sweeping log.

19   CSL Motion at 7.  To support these claims, CSL offers the expert testimony of James E. Houck, Ph.D.

20   Dr. Houck, in turn, offers three types of evidence: testing data commissioned by CSL relating to the

21   efficacy of Imperial's SUPERSWEEP Plus log; a critique of Imperial's tests concerning the efficacy of the

22   SUPERSWEEP Plus log; and an assessment of the ability of the chemical compounds present in the

23   SUPERSWEEP Plus log to act as combustion catalysts.  CSL also challenges the admissibility of the

24   evidence provided by Imperial's expert witness, Abraham Kelly.

25         **1.    CSL's test data**

26         CSL commissioned Omni-Test Laboratories, Inc., ("Omni") of Beaverton, Oregon, to test the

27   ability of Imperial's SUPERSWEEP Plus log to reduce chimney creosote.  CSL Motion at 5.  Omni

28   performed a single round of tests involving four stoves – two control stoves and two test stoves.  *Id.*  In

United States District Court

For the Northern District of California

order to accumulate creosote deposits in the chimneys, numerous fires were burnt in each stove.  Houck

Decl. at ¶19.  The stoves were weighed before and after this accumulation period so as to determine the

amount of "starting creosote" that had been deposited in each.  *Id.* at ¶16.

After accumulating starting creosote in the stoves, the efficacy of the SUPERSWEEP Plus log was

tested.  The test involved two parts, the first of which consisted of (1) starting a fire in each of the stoves,

(2) achieving consistent flue gas temperatures[5] of between 350°F and 425°F, as measured 48" above the

chimney base, (3) adding either a single control log to each of the control stoves or a single

SUPERSWEEP Plus log to each of the test stoves, and (4) allowing the control and SUPERSWEEP Plus

logs to burn to completion while maintaining the flue gas temperature between 350°F and 425°F.  Houck

Decl. at ¶¶ 19-23.  The next day a fire was burnt in each of the four stoves, after which the stoves were

weighed once again.  *Id.*  The differences in the weight of the stoves before and after this first part of the

test were as follows:

| Stove | Creosote Weight Gain (g) |
|-------|--------------------------|
| A, control | 71.5 |
| B, test | 19.5 |
| C, test | 44.4 |
| D, control | 12.5 |

*Id.* at ¶¶ 28-35 & Table 1.

For the second part of the test, Omni allowed the four stoves to "age" for ten days, after which four

fires (one fire/day) were burnt in each of the four stoves.  Houck Decl. at ¶¶ 24-26.  Upon completion of

this part of the test, the stoves were weighed again, and the creosote weight gains attributable to *both* parts

of the test were determined.  *Id.*  The results were as follows:

| Stove | Creosote Weight Gain (g) |
|-------|--------------------------|
| A, control | 329 |
| B, test | 303 |

---

[5]  A "flue gas temperature" is a measure of the temperature of the air within the chimney.  Flue gas temperatures will always be higher than a temperature taken at the same height on the chimney but from the surface.  *See* Kelly Decl. at ¶43.

| C, test | 341 |
| D, control | 387 |

*Id.* at ¶¶ 28-35 & Table 1.

Due to the fact that the test stoves (Stoves B and C) gained weight during the experiment, Dr. Houck concluded that the SUPERSWEEP Plus log did not reduce creosote, as claimed by the packaging. Houck Decl. at ¶33.

In a follow up test, Omni had the chimneys of the four stoves used in the experiment cleaned by a chimney sweep. Houck Decl. at ¶27. An average of 37% of the creosote present in the control stoves was removed by sweeping, while an average of 39.5% of the creosote present in the test stoves was removed by sweeping. Houck Decl. ¶35. From this data, Dr. Houck concluded that treating the test stoves with Imperial's SUPERSWEEP Plus logs failed to loosen the creosote deposits present in the test chimneys, and thus failed to assist in their removal. *Id.* at ¶¶ 34-35 & Table 2.

### 2. CSL's assessment of Imperial's test data

CSL also had Dr. Houck review Imperial's test data. Based on his review, Dr. Houck concluded that Imperial's testing procedures were poorly supervised and riddled with error, thus rendering their conclusions unreliable. Houck Reply Decl. at ¶¶ 3-32; Plaintiff CSL, L.L.C.'s Reply re Motion for Finding of Contempt, filed December 10, 2004 ("CSL Reply") at 2-4.

CSL contends that "Imperial has not submitted evidence that a single person directly involved with its testing had any relevant experience or training." CSL Reply at 3. In particular, CSL criticizes Imperial's testing procedures because: 1) Imperial used its own employees to conduct the tests, without providing evidence that they were qualified to do so; 2) Imperial used its own in-house facilities to conduct the tests, without providing evidence that its facilities are certified for such tests; 3) there is no evidence that "testing institute guidelines or standard laboratory protocols" were followed during the course of the testing; 4) there is no evidence that Imperial's testing methodology was "anything more than an *ad hoc* process employed for the first time in this dispute"; 5) Mr. Nowlan, who was hired by Imperial to supervise the testing, admits to having no relevant experience or training; and 6) Imperial's expert, Mr. Kelly, simply reviewed the test

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    results and thus has no personal knowledge regarding the tests. *Id.* at 2-3. Because of these factors, CSL

2    argues that Imperial's test results are "fatally flawed." *Id.* at 1.

3          In addition, CSL argues that the test data provided by Imperial is itself evidence of the inconclusive

4    nature of their test results. Houck Reply Decl. at ¶¶3-32; CSL Reply at 3-4. For example, CSL notes that

5    the test/control fires in Imperial's experiments were burned at a higher temperature than the fires used to

6    deposit creosote in the chimneys in the first place. Houck Reply Decl. at ¶¶ 8-9; CSL Reply at 3-4. As a

7    result, CSL alleges that the "tests are not probative of the efficiency of the SUPERSWEEP Plus product,

8    but merely demonstrate the well-known fact that creosote will burn at higher temperatures." Houck Reply

9    Decl. at ¶¶ 5, 8, 10; CSL Reply at 4. Furthermore, CSL contends that increased creosote reduction that

10   occurred in test stoves (i.e., stoves in which the SUPERSWEEP Plus log were burnt) as compared to

11   control stoves was likely due to the burning of hotter fires in the test stoves. Houck Reply Decl. at ¶¶ 19,

12   23.

13         CSL also identifies numerous technical problems and errors in Imperial's tests that allegedly

14   highlight the unreliable nature of the data. CSL Reply Brief at 3-4; Houck Reply Decl. at ¶¶ 3-31. For

15   example, in Imperial's July test, a mechanical malfunction caused the loss of the temperature data for the

16   control stove. Houck Reply Decl. at ¶3. CSL claims that, as a consequence, it is impossible to separate

17   out the effect of higher fire temperature from the effect of the SUPERSWEEP Plus log, and thus the July

18   test data should be given no weight. *Id.*

19         With regard to Imperial's Test 1 results, CSL observes that the fires in the test stoves occasionally

20   exceeded 1300°F, which never happened with the fires in the control stoves. Houck Reply Decl. at ¶19 &

21   Table 2. According to CSL, this difference provides an explanation for the increased creosote reduction

22   observed in the test stoves. *Id.* at ¶¶ 17-20. Furthermore, CSL alleges that the fires were so hot in the

23   test stoves that a chimney fire occurred in Stove 1.[6]  CSL Reply Brief at 3; Houck Reply Decl. ¶¶ 11-12.

24   CSL also points out that, during Test 1, control Stove 2 lost more creosote in the upper sections of its

25   _____

26        [6] On this basis, CSL suggests that Imperial's SUPERSWEEP Plus log poses a consumer safety risk,
     since it encourages consumers to burn hot fires that have the potential to lead to uncontrolled chimney fires.

27   Houck Reply Decl. ¶¶ 12-16. This assertion is undermined, however, by Dr. Houck's statement that
     "Imperial's chimney fires were likely small and innocuous" because "the accumulated mass of creosote in the

28   test chimneys was much less than might be found in an impacted residential chimney." *Id.* at ¶15.

**United States District Court**

For the Northern District of California

chimney than in the lower sections.  Houck Reply Decl. ¶21.  Dr. Houck argues that this is inexplicable since heat is the only mechanism for removing creosote in a control chimney and the fire's exhaust gas cools as it rises.  *Id.*

With regard to Imperial's Test 2 results, CSL identifies a wide range of concerns.  In particular, CSL argues that: (1) the absence of temperature data relating to when the creosote deposits were initially built-up is problematic because there is no assurance that the creosote collected in each stove has similar qualities; (2) Imperial must have varied its test protocol between Test 1 and Test 2, since the controls give different results in the two tests; (3) the chimney temperatures at the start of Test 2 were very cold, allegedly adding uncertainty to the test results; and (4) the temperature data reveal wild fluctuations that would have been a shock to the chimneys and thereby contributed to creosote removal.  Houck Reply Decl. ¶¶ 22, 25-26, 31-32.  In addition, as with Test 1, CSL alleges that the temperatures of the fires in the test stoves were hotter than those in the control stoves, thus accounting for differences in creosote reduction during Test 2.  *Id.* at ¶¶ 23-24 & Table 3.  Finally, CSL argues that Imperial's employees failed to accurately measure the weights of the chimneys during Test 2, since sections 16 and 17 of Stove 4 lost more creosote than theoretically possible, while control Stove 2 inexplicably and unreasonably gained 360g of creosote during a single fire.[7]  *Id.* at ¶¶ 27-29.

### 3.   CSL's assessment of the chemical catalysts present in Imperial's SUPERSWEEP Plus log

CLS argues that the composition of the SUPERSWEEP Plus log is further evidence that it is not capable of reducing chimney creosote.  CSL Reply Brief at 4-5; Houck Decl at ¶¶ 36-40; Houck Reply Decl. at ¶¶ 33-60.  Based on a chemical analysis commissioned by Dr. Houck, the SUPERSWEEP Plus log is composed primarily of wood fiber supplemented with the following inorganic chemicals:

| Chemical Component | Percent of SUPERSWEEP Plus log |
|---|---|
| Sodium Chloride | 5% |
| Sulfate | 0.08% |

---

[7]  Based on CSL's test data, one might expect an average fire to produce 60-70g of creosote deposit on a chimney.  However, it is unclear whether CSL's numbers are relevant to Imperial's since differences in chimney construction might affect the size of the creosote deposit, and CSL provides no statistical data as to the likelihood of having a particularly large creosote deposit.

| Calcium | 0.1% |
|---------|------|
| Copper | 0.07% |
| Iron | 0.02% |
| Zinc | 0.06% |

Houck Decl. ¶¶ 34-35 & Table 4.

CSL concedes that the references cited by Imperial describe the use of sodium chloride, copper, iron, and zinc to reduce creosote. CSL Reply Brief at 4-5. However, CSL argues that the publications are not relevant to the present inquiry because they are not reliable, they concern creosote reduction under dissimilar circumstances, such as in coal burning appliances or diesel engines, and the quantities of creosote reduction catalysts contemplated in the publications significantly exceed those present in the SUPERSWEEP Plus log. Houck Reply Decl. at ¶¶ 36-60.

### 4. CSL claims that the testimony of Imperial's expert, Mr. Kelly, is inadmissible

Finally, CSL argues that the testimony of Imperial's expert, Mr. Kelly, is inadmissible. CSL Reply Brief at 8. As part of this argument, CSL asserts that Imperial's test results were prepared for this litigation and, consequently, Imperial must provide some objective, verifiable evidence that the testing procedures were reliable in order for Mr. Kelly to comment upon the test results. *Id.* CSL claims that Imperial's testing procedures were unreliable because Imperial: 1) employed an *ad hoc* test; 2) used Imperial employees to perform the tests; 3) failed to provide evidence that its employees were qualified to conduct the tests, or that its testing facilities were certified to perform the test; 4) employed Mr. Nowlan rather than Mr. Kelly to supervise the tests, even though Mr. Nowlan lacks special knowledge or expertise with respect to chimney creosote; and 5) produced test data that contains obvious errors. *Id.* at 1, 8.

CSL further claims that Mr. Kelly's testimony is inadmissible because he failed to detect obvious errors in Imperial's testing procedure, revealing that he "did not employ an appropriate level of intellectual rigor" in assessing the test results. CSL Reply Brief at 8. Finally, CSL argues that Mr. Kelly's testimony is inadmissible because he was involved in designing the SUPERSWEEP Plus log, and thus has a vested interest in demonstrating that the product works. *Id.*

**United States District Court**
For the Northern District of California

1    Despite CSL's objection to Mr. Kelly's expert testimony, at the hearing on February 11, 2005,

2    CSL argued that experimental data concerning the efficacy of the SUPERSWEEP Plus log should be

3    considered by the Court, even if it does not meet the standard of reliability set forth in Rule 702.  According

4    to CSL, the Injunction could not possibly require CSL to prove contempt using scientific evidence that

5    meets the Rule 702 standard of reliability, since methods of testing creosote reduction by fire logs have not

6    been developed outside the context of this litigation.

7    **E.    Defendant's Response**

8    Imperial argues that CSL's contempt motion must fail because CSL has not shown by clear and

9    convincing evidence that Imperial did not substantially comply with a good faith, reasonable interpretation of

10   the Injunction.  Imperial Opposition at 18-19.  To support its argument, Imperial asserts (1) that the results

11   of its own testing, as well as the testing performed by CSL, support the finding that Imperial complied with

12   paragraphs 1 and 2 of the Injunction, and (2) that the testimony offered by CSL's expert, Dr. Houck, is

13   inadmissible.

14   **1.    Imperial alleges that it has substantially complied with the Injunction**

15   Imperial asserts that the SUPERSWEEP Plus log reduces chimney creosote and that each of the

16   disputed representations on the SUPERSWEEP Plus log's packaging are true.  Imperial Opposition at 16.

17   Imperial addresses each of these issues as they relate to the paragraphs of the Injunction.

18   **a)    Paragraph 2**

19   Paragraph 2 of the Injunction provides that Imperial may not use the SUPERSWEEP mark on any

20   new firelog product "unless such Future Fire Log Product has the demonstrated capability to remove or

21   reduce creosote in chimneys and/or aid in the loosening and breaking away of creosote deposits."  As

22   discussed *supra*, Imperial claims that it has conducted tests on the efficacy of the SUPERSWEEP Plus log

23   and that all of the available test data, including CSL's, show that chimneys accumulate less creosote when a

24   SUPERSWEEP Plus log is burnt in them, as compared to when a wood fire alone is burnt.  Imperial

25   Opposition at 7-11, and 14.  Imperial argues that the decreased accumulation of creosote amounts to a

26   reduction and that, as a result, it has complied with paragraph 2 of the Injunction.  *Id.* at 16.  Furthermore,

27   at the hearing on February 11, 2005, Imperial argued that the results of Test 2 show that the

28

1   SUPERSWEEP Plus log not only reduces the accumulation of creosote, but also eliminates chimney

2   creosote.

3                    **b)        Paragraph 1(a)**

4        Paragraph 1(a) of the Injunction prohibits Imperial from falsely representing that the

5   SUPERSWEEP Plus log "helps eliminate dangerous creosote in a chimney."  In contrast, the current

6   SUPERSWEEP Plus packaging states that the log "helps *reduce* dangerous creosote in your chimney."

7   Imperial Opposition at 16 (emphasis added).  According to Imperial, both its own test data (described

8   *supra*) and CSL's, show that chimneys accumulate less creosote when a SUPERSWEEP Plus log is burnt

9   in them, as compared to when a wood fire alone is burnt.  *Id.* at 14.  Imperial contends that a decrease in

10  accumulation is a reduction, and thus it is not in contempt of paragraph 1(a) of the Injunction.  *Id.* at 16.

11                   **c)        Paragraph 1(b)**

12       Paragraph 1(b) enjoins Imperial from falsely representing that the SUPERSWEEP Plus log "helps

13  prevent chimney fires."  The current packaging of the SUPERSWEEP Plus states that it "reduces the risk of

14  chimney fires." Imperial Opposition at 17.  Imperial notes that CSL has already admitted that having less

15  creosote in a chimney reduces the risk of chimney fires.  *Id.*  Based on CSL's admission, and the test data

16  showing that the SUPERSWEEP Plus reduces creosote build-up, Imperial argues that this assertion must

17  be true and, therefore, Imperial cannot be in contempt of paragraph 1(b) of the Injunction.  *Id.*

18                   **d)        Paragraph 1(c)**

19       Paragraph 1(c) prohibits Imperial from falsely representing that the SUPERSWEEP Plus log

20  "contains powdered combustion catalysts."  The current packaging of the SUPERSWEEP Plus states that

21  the log "contains chemical compounds that act as combustion catalysts."  Imperial Opposition at 17.

22  According to Imperial, Dr. Houck has admitted that the SUPERSWEEP Plus contains chemicals such as

23  sodium chloride, zinc, iron, and copper.  *Id.*  Since these very chemicals have been recognized as

24  combustion catalysts that act upon creosote deposits, Imperial contends that the representation is true and,

25  thus, it is not in contempt of paragraph 1(c) of the Injunction.  *Id.*

26                   **e)        Paragraph 1(d)**

27       Paragraph 1(d) enjoins Imperial from falsely representing that the SUPERSWEEP Plus log "aids in

28  the loosening and breaking away of hard, scaly or glazed creosote."  The current SUPERSWEEP Plus

**United States District Court**
For the Northern District of California

1   packaging states that "these [combustion] catalysts can also help to weaken, loosen, and break away some

2   of the hard, scaly or glazed deposits that may be difficult to remove by chimney brushing alone."  Imperial

3   Opposition at 17-18 (emphasis added).  Imperial does not provide data to support this claim, but instead

4   relies upon the teachings of scientific publications cited by Mr. Kelly.  *Id.*  According to Imperial, these

5   publications indicate that "combustion catalysts have an effect on creosote by reducing its combustion

6   temperature and by causing it to become flaky."  *Id.*  Imperial concludes that the current representation is

7   true, and thus it is not in contempt of paragraph 1(d) of the Injunction.   *Id.*

8                    **f)        Paragraph 1(e)**

9          Paragraph 1(e) enjoins Imperial from falsely representing that the SUPERSWEEP Plus log "lowers

10  the combustion point of the creosote and soot deposits in a chimney flue by up to 500$^\circ$F."  The current

11  SUPERSWEEP Plus packaging no longer contains this representation, but instead claims that "the

12  combustion catalysts help facilitate the burning of creosote and soot which can build up in chimneys."  CSL

13  Motion at 4.  Imperial does not explicitly address the validity of this representation, but merely makes the

14  general claim that all of the representations on the SUPERSWEEP Plus's current packaging are true.

15  Imperial Opposition at 2-4, and 16.  Nevertheless, implicit in Imperial's arguments is the idea that a

16  fundamental characteristic of creosote combustion catalysts is that they facilitate the burning of creosote.

17  *Id.  See also* Kelly Decl. at ¶19; Houck Reply Decl. at ¶33.

18                   **g)        Paragraph 1(f)**

19         Paragraph 1(f) enjoins Imperial from falsely representing that the SUPERSWEEP Plus log is a

20  "chimney cleaning log."  Imperial has retained this representation on the current SUPERSWEEP Plus

21  packaging.  CSL Motion at 4, line 24.  According to Imperial, its tests demonstrate that the

22  SUPERSWEEP Plus log reduces the amount of creosote in chimneys, and thus it "necessarily results in

23  some cleaning of the chimney."  Imperial Opposition at 18.  Based on this reasoning, Imperial argues that

24  the representation is true, and that it is therefore not in contempt of paragraph 1(f) of the Injunction.  *Id.*

25         **2.        Imperial claims that the testimony of CSL's expert, Dr. Houck, is
26                     inadmissible**

27         Imperial objects to Dr. Houck's testimony, including his description and analysis of CSL's tests,

28  which he presided over at Omni-Test Laboratories, Inc.  Imperial Opposition at 19-22.  Imperial claims

United States District Court

For the Northern District of California

that Dr. Houck's testing procedures are inconsistent and lack sufficient scientific basis, and thus do not

meet the standard of reliability set forth in Rule 702.  According to Imperial, Dr. Houck's testing

procedures are inconsistent because they are unrelated to both the instructions provided on the packaging

of the SUPERSWEEP Plus log and the testing procedures that Dr. Houck previously used on the original

SUPERSWEEP log.[8]  Imperial notes that, contrary to the instructions provided with the SUPERSWEEP

Plus log,[9] Dr. Houck's tests employ a post-test fire which could only skew the test results by causing new

creosote deposits.  *Id.* at 6.  In addition, Imperial alleges that Dr. Houck burned the SUPERSWEEP Plus

logs at sub-optimal temperatures during his testing, at least in part because he took temperature

measurements of the flue gas rather than the surface of the chimney.  *Id.* at 12, 22.

At the hearing on February 11, 2005, Imperial argued that CSL's evidence should be required to

meet the high standards of the Federal Rules of Evidence because the present motion is being heard in

federal court.  At the same hearing, however, Imperial argued that the evidence that it seeks to submit on

the efficacy of the SUPERSWEEP Plus log should be considered even if it would otherwise be unreliable

under *Daubert*.  According to Imperial, its evidence differs from CSL's because it is being submitted to

show compliance with the Injunction.  Furthermore, Imperial argues that, at the time the parties signed the

---

[8] When CSL tested Imperial's original SUPERSWEEP log, the protocol designed and used by Dr. Houck included seven post-treatment fires before the stove chimneys were weighed for a determination of how much creosote had been gained or lost.  Houck Reply Decl. at ¶84.  In comparison, the protocol used by Dr. Houck to test the SUPERSWEEP Plus log included only a single post-treatment fire.  *Id.*  Dr. Houck contends that the reason for the change was that Imperial changed the instructions on its product packaging.  *Id.*  According to Dr. Houck, the old packaging stated that "[w]hile burning fires over the next seven days, the treated creosote and soot flue deposits would continue to be burned to a fine ash," while the current packaging does not include such instructions.  *Id.* at ¶85.  Imperial contends that Dr. Houck should have "simply buil[t] a test fire and measure[d] the creosote remaining in the chimney,"without including steps that would merely add to the uncertainty of the results, such as the post-treatment fire.  Imperial Opposition at 21.

[9] The instructions on the packaging of the SUPERSWEEP Plus log are as follows:

For maximum effect, place the **SUPERSWEEP™ Plus** log on a HOT fire.  Follow instructions below and inside the carton.  **1.** FULLY open the stove or fireplace damper.  **2.** Light a normal wood fire; wait until the fire becomes HOT!  **3.** Place one **SUPERSWEEP™ Plus** log on the HOT fire. **4.** Close stove or fireplace doors, screens, or enclosures.  Keep air intakes open and maintain a high temperature.  **Note:** The **SUPERSWEEP™ Plus** log requires high flue temperatures in excess of 180°C (350°F) to be fully effective.  DO NOT burn more than one **SUPERSWEEP™ Plus** log at a time.

Houck Decl. at ¶13 & Exh. C.

United States District Court

For the Northern District of California

1    Injunction, there was an understanding that any evidence used to "demonstrate" the efficacy of the

2    SUPERSWEEP Plus log would not have to satisfy *Daubert* given that chimney cleaning logs represent a

3    new technology that has not been independently studied by the scientific community.

4         Imperial also claims that Dr. Houck's testimony regarding the scientific underpinnings of the

5    SUPERSWEEP Plus log is inadmissible.  Opposition at 1, 20.  According to Imperial, Dr. Houck simply

6    opines that the metallic salts and other compounds present in the SUPERSWEEP Plus log cannot act as

7    combustion catalysts, and fails to provide publications that contradict those cited by Imperial.  *Id.*

8    **III.    DISCUSSION**

9         **A.    Legal Standard**

10        In a civil contempt proceeding, "[t]he moving party has the burden of showing by clear and

11   convincing evidence that the contemnors violated a specific and definite order of the court."  *F.T.C. v.*

12   *Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999).  Civil contempt occurs when a party fails to

13   take all reasonable steps to comply with a specific and definite order of the court, and such failure causes

14   the party to violate the order.  *Go-Video v. Motion Picture Ass'n of Am.*, 10 F.3d 693, 695 (9th Cir.

15   1993).  A party's failure to comply need not be intentional, and there is no good faith exception to the

16   requirement of obedience to a court order.  *Id.*

17        For the purposes of construction and enforcement, consent decrees are "governed by principles of

18   local law which apply to interpretation of contracts generally."  *United Commercial Ins. Serv., Inc. v.*

19   *Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992) (internal quotations omitted); *see also Hook v.*

20   *Arizona*, 972 F.2d 1012, 1014 (9th Cir. 1992) ("consent decrees are construed as contracts for the

21   purposes of enforcement").  "The intention of the parties must, in the first instance, be derived from the

22   language of the entire contract."  *Royal Thrift and Loan Co. v. County Escrow, Inc.*, 123 Cal. App. 4th

23   24 (Cal. Ct. App. 2004).  As in a contract, vague language in a consent decree cannot be enforced; "to do

24   so is an invalid exercise of judicial authority."  *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689

25   F.2d 885, 889 (9th Cir. 1982).  Consequently, "if a defendant's action 'appears to be based on a good

26   faith and reasonable interpretation of (the court's order)' he should not be held in contempt."  *Id.* (quoting

27   *Rinehart v. Brewer*, 483 F. Supp. 165, 171 (S.D. Iowa 1980)).  Furthermore, substantial compliance with

28

United States District Court

For the Northern District of California

the terms of a consent judgment is a defense to a finding of civil contempt.  *Id*. at 891.  So long as a party "has taken 'all reasonable steps' to comply with the order, technical or inadvertent violations of the order will not support a finding of civil contempt."  *Gen. Signal Corp. v. Donallco, Inc*., 787 F.2d 1376, 1379 (9th Cir. 1986).

### B.    Admissibility Of Expert Testimony

The outcome of CSL's Motion depends in part upon the reliability and admissibility of expert testimony relating to the efficacy of the SUPERSWEEP Plus logs.  Because each side has challenged the admissibility of the other side's expert testimony evidence, it is necessary to consider, as a preliminary matter, whether any of the expert witness testimony offered in connection with this contempt motion can be considered by the Court.  Ordinarily, the admissibility of expert witness testimony is governed by Rule 702, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts.

In determining whether scientific or technical knowledge "will assist the trier of fact," the trial court must focus on the principles and methodology, and not the conclusions that they generate.  *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 595 (1993) (*Daubert I*).

When an expert's testimony is based on research conducted by the expert independent of the litigation, there exists "objective proof that the research comports with the dictates of good science."  *Daubert v. Merrell Dow Pharm., Inc*., 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*) (on remand from *Daubert I*).  If, on the other hand, the "expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'"  *Id*. at 1317-18.  To determine if the expert's testimony is supported by other objective, verifiable evidence, the trial court "may consider whether the methods used to generate the expert opinion have been subjected to peer review and publication; whether the technique can be tested; the known potential rate of error; and whether the expert's methodology is generally accepted within his or

1  her field of expertise." *AT&T Wireless*, 308 F. Supp. 2d 1148,1157 (S.D. Cal. 2003) (citing *Daubert I*,

2  509 U.S. at 593-94).

3         Judged by the standard of reliability set forth in Rule 702, the expert witness testimony of both CSL

4  and Imperial regarding the testing of the product is inadmissible.  Both sides present expert testimony based

5  upon research prepared for the purpose of this litigation, and neither side has presented any "objective,

6  verifiable evidence that the testimony is based on 'scientifically valid principles.'"  *See Daubert II*, 43 F.3d

7  at 1317.  The methods used to test the efficacy of the SUPERSWEEP Plus logs have not been reported in

8  any peer-reviewed scientific publications, there is no indication that either methodology is generally

9  accepted by other scientists, and the error rates of the methodologies are completely unknown.  *See id.*

10        This latter point is particularly important.  The tests of both sides vary widely in their results.

11  Nonetheless, each attempts to draw conclusions from just a couple of stoves.  CSL in particular used only

12  2 test stoves and 2 control stoves.  There is no indication in the record that the error rate is known, let

13  alone so low that a test with only 2 stoves will yield reliable results.

14        However, even though the parties' evidence may not meet the requirements of Rule 702, the Court

15  may still consider that evidence if it is sufficient to meet the standard envisioned by the parties when they

16  entered into the consent decree.  *See United Commercial*, 962 F.2d at 856 (holding that principles of

17  contract interpretation govern the enforcement of consent decrees); *Royal Thrift*, 123 Cal. App. 4th at 24.

18  In this case, Paragraph 2 of the Injunction prohibits Imperial from selling fire logs that bear the

19  SUPERSWEEP mark unless Imperial has evidence that "demonstrates " the ability of the fire logs to

20  remove, reduce, or loosen creosote deposits.  The Injunction does not, however, expressly address the

21  standard to apply in determining whether this burden has been met.

22        One possibility is that the parties believed that only evidence meeting the standards of Rule 702

23  could be used to make the demonstration.  The Injunction imposes no such burden.  It uses the word

24  "demonstrate" rather than "proves."  In addition, at a time when there is no established testing

25  methodology, Paragraph 2 effectively shifts the burden of proving this "demonstration" to the party to be

26  charged with contempt of court.  The Injunction did not envision that Imperial would be in contempt of

27  court, and could not market any SUPERSWEEP log, unless and until this new science of testing fire logs

28

**United States District Court**

For the Northern District of California

United States District Court

For the Northern District of California

developed enough to withstand a Rule 702 *Daubert* challenge.  In any event, both parties agree that Imperial's demonstration need not meet this test.

At the time the parties agreed to the consent decree, the only protocol for measuring the creosote-reducing capacity of a fire log was the one devised and used by Dr. Houck to test the efficacy of Imperial's original SUPERSWEEP log.  Because the tests that Imperial and CSL conducted on the SUPERSWEEP Plus logs are highly similar to Dr. Houck's original protocol, the Court concludes that, at the least, the parties agreed that a product which "demonstrates" the requisite capabilities as tested by a protocol similar to Dr. Houck's would not violate Paragraph 2 of the Injunction.  Accordingly, and in light of the fact that a more reliable testing protocol has not been developed, the Court shall consider CSL's and Imperial's experts' testimony regarding Paragraph 2 of the Injunction.

To prove a violation of Paragraph 1 of the Injunction, on the other hand, CSL must prove (by clear and convincing evidence) that certain claims are in fact **false**.  A mere "demonstration" one way or the other will not carry this burden.  Falsity must be proven.  This difference in language leads the Court to conclude that the testimony admissible under Rule 702 and *Daubert* is required to prove a violation of Paragraph 1.  Accordingly, the testing done by both sides is not admissible to prove or disprove a violation of Paragraph 1 of the Injunction.

### C.   CSL Has Not Shown By Clear And Convincing Evidence That Imperial Is In Violation Of The Injunction

To prevail on its motion, CSL must show by clear and convincing evidence that Imperial  has failed to comply with a reasonable interpretation of the Injunction.  *See Vertex*, 698 F.2d at 889.  CSL has not carried this burden.  Neither its test results, nor its criticisms of Imperial's test results, has shown by this standard that Imperial's firelog does not have a "demonstrated capability" of removing creosote or aiding in the loosening and breaking away of creosote," (Paragraph 2 of the Injunction).  CSL has also not provided admissible scientific evidence that Imperial has violated Paragraph 1 of the Injunction.

United States District Court

For the Northern District of California

1. **CSL has not shown by clear and convincing evidence that Imperial is in contempt of Paragraph 2 of the Injunction**

CSL claims that Imperial is in violation of Paragraph 2 of the Injunction, which enjoins Imperial from using the SUPERSWEEP mark on any new fire log product marketed in the United States "unless such Future Fire Log Product has the demonstrated capability to remove or reduce creosote in chimneys and/or aid in the loosening and breaking away of creosote deposits."  To establish that Imperial is in contempt of Paragraph 2, CSL must show by clear and convincing evidence that: 1) Imperial has used the SUPERSWEEP mark on a new fire log product marketed in the United States; and 2) Imperial has not demonstrated that the SUPERSWEEP Plus log is capable of removing or reducing creosote in chimneys or aiding in the loosening and breaking away of creosote deposits found in chimneys.  CSL has not met its burden.

a. **Imperial has introduced evidence that the SUPERSWEEP Plus log is capable of removing and reducing chimney creosote**

To demonstrate the efficacy of its SUPERSWEEP Plus logs, Imperial conducted tests based upon the methodology developed and used by Dr. Houck to test the original SUPERSWEEP log.  As discussed *supra*, Imperial contends that the results of Test 1 demonstrate that the SUPERSWEEP Plus logs are capable of reducing the amount of new creosote deposited on a chimney during the course of burning a treatment fire, while the results of Test 2 demonstrate that the logs have the ability to remove creosote present in the chimney prior to burning a treatment fire.  The results reported by Imperial for Test 1 and Test 2 are consistent with these contentions, which find further support in the declaration of Mr. Kelly.  The Court concludes that Imperial has made a prima facie demonstration in compliance with Paragraph 2 of the Injunction.

b. **CSL has failed to show that Imperial's test results are clearly unreliable**

CSL asserts that Imperial's test results are unreliable and, thus, fail to demonstrate that the SUPERSWEEP Plus log has the ability to remove or reduce creosote in chimneys.  According to CSL, Imperial's test results are unreliable because Imperial used an *ad hoc* methodology, the tests were performed at Imperial's own facilities using untrained employees, and the tests results themselves reveal

United States District Court

For the Northern District of California

1    procedural inconsistencies and errors.  CSL Reply at 1, 8.  The Court concludes that, based on the record,

2    CSL has not established by clear and convincing evidence that Imperial's test results are an inadequate

3    demonstration of the capability required by Paragraph 2 of the Injunction.

4           The Court notes that it is not in a position to determine whether the SUPERSWEEP Plus log *in*

5    *fact* is capable of removing or reducing creosote in chimneys, or aiding in the loosening of creosote

6    deposits.  Neither party submitted any evidence in compliance with Rule 702 that would permit such a

7    conclusion.  Rather, given the lower standard of scientific rigor envisioned by Paragraph 2 of the Injunction,

8    CSL has not convinced the Court that the flaws it identifies in Imperial's proofs justify holding Imperial in

9    contempt.

10

11                                **i.)        Imperial's testing protocol**

12          Imperial's testing protocol differed in two key respects from the protocol developed by Dr. Houck:

13   1) all post-treatment fires were eliminated; and 2) the treatment fires were burned at a higher temperature

14   than the fires used to accumulate creosote.  The question arises whether Imperial acted reasonably when it

15   decided to modify Dr. Houck's original testing protocol.  *See Vertex Distrib.*, 689 F.2d at 889 (holding

16   that a defendant should not be held in contempt if his actions are based on a good faith and  reasonable

17   interpretation of the court's order).

18          The Court concludes that Imperial's modifications of Dr. Houck's protocol were reasonable.  Dr.

19   Houck himself made changes to his original protocol when he performed tests on the SUPERSWEEP Plus

20   logs.  Houck Reply Decl. at ¶84.  According to Dr. Houck, the changes were made because Imperial had

21   changed the instructions on the SUPERSWEEP Plus packaging.  *Id.*; *see also* n.7, *supra*.  The changes

22   made by Imperial were also designed to make the testing protocol more accurately reflect the instructions

23   provided on the SUPERSWEEP Plus packaging.  In fact, as measured against the SUPERSWEEP Plus

24   instructions, Imperial's approach may even be superior to CSL's because: (1) the instructions indicate that

25   the logs should be introduced into a "HOT" fire (suggesting that treatment fires are to be hotter than normal

26   fires that deposit creosote); and (2) there is no indication in the instructions that post-treatment fires are

27   needed to ensure that the logs function as claimed.  *See* n.8, *supra*.

28

**United States District Court**

For the Northern District of California

1    In addition, since the Injunction does not specify the precise testing protocol that must be used to

2    demonstrate the efficacy of the SUPERSWEEP Plus logs, the Court cannot force Imperial to adopt a

3    particular protocol.  *See Vertex Distrib*., 689 F.2d at 889 (holding that it is an "invalid exercise of judicial

4    authority" to enforce vague language in a consent decree).  Rather, the Court can only require that Imperial

5    use a protocol that is reasonable in light of the Injunction's requirements.  *Id.*  Since the plain purpose of the

6    Injunction is to prevent Imperial from engaging in false advertising, it was reasonable for Imperial to make

7    changes to Dr. Houck's original testing protocol in order to tailor the protocol to the specific instructions

8    provided on the SUPERSWEEP Plus packaging.

9                              **ii.)      Imperial's testing facilities**

10    CSL's argument that Imperial's test results are unreliable because the tests were conducted at

11    Imperial's own facilities, using untrained employees, is also unconvincing.  Since the Injunction does not

12    specify that the demonstrative tests have to be conducted at a particular facility, Imperial is only required to

13    have acted reasonably with regard to the facilities and individuals used to test the SUPERSWEEP Plus

14    logs. *See Vertex Distrib*., 689 F.2d at 889.  At the hearing on February 11, 2005, Imperial stated that the

15    *only* independent testing facility that has experience testing the creosote-reducing capabilities of fire logs is

16    Omni.  CSL does not dispute this claim.  Since Omni was already employed by CSL for the purpose of this

17    litigation, Imperial's decision to have the tests done at its own facilities was not unreasonable.

18    Furthermore, Imperial chose to confront directly the possibility of biased test results by hiring Rick

19    Nowlan, an independent third party, to verify that the protocol adopted by Imperial was followed during

20    the testing.  Imperial Opposition at 6.  Although CSL points out that Mr. Nowlan has no expertise in the

21    field of chimney maintenance products or product testing, *see* CSL Reply at 3 & n.1, CSL does not explain

22    why Mr. Nowlan could not carry out his task as an independent observer.  Given the intuitive nature of Dr.

23    Houck's testing protocol, it was not unreasonable for Imperial to believe that Mr. Nowlan would be an

24    adequate independent observer.  Finally, as discussed further *infra*, CSL can point to few errors in

25    Imperial's test results that would lend credibility to the theory that Imperial's use of its own facilities and its

26    untrained employees undermined the reliability of the test results.

27                             **iii.)      Errors in Imperial's test results**

28

24

1    CSL argues that Imperial did not conduct the tests with sufficient care.  CSL notes, for example,

2    that the test fires in Test 1 were burned at consistently hotter temperatures than the control fires, and that a

3    chimney fire occurred in one of the test stoves.  CSL Reply at 3-4; Houck Reply Decl. at ¶¶ 11-12,19 &

4    Table 2.

5    CSL's critiques of Test 1 are unconvincing.  Imperial has introduced the results of Test 1 for the

6    sole purpose of showing that the SUPERSWEEP Plus log is capable of reducing the accumulation of

7    chimney creosote that accompanies the burning of a fire.  Imperial Opposition at 16.  They have introduced

8    evidence that the protocol used was appropriate and demonstrates a reduction in creosote accumulation.

9    Indeed, some of CSL's own test results indicate that burning a SUPERSWEEP Plus log in a stove results in

10   at least some reduction in the amount of creosote accumulation.  The problems which CSL identifies in

11   Imperial's Test 1 results do not render the results inaccurate.

12   With regard to Imperial's Test 2 results, the alleged defects that CSL highlights likewise fail to

13   clearly and convincingly show that the results are an inadequate demonstration of the efficacy of the

14   SUPERSWEEP Plus logs.  For example, CSL argues that the absence of temperature data for the fires that

15   were used to build up creosote deposits in the chimney means that Imperial cannot be sure that the

16   creosote collected in each stove had similar qualities.  Houck Reply Decl. at ¶22.  Dr. Houck, however,

17   states that the temperature of a fire affects both the type and *amount* of creosote deposited in a chimney.

18   *Id.* at ¶5.  Since the quality and quantity of creosote are related, the amount of creosote in each stove at the

19   start of a test is presumably a reflection of differences in quality.  The amount of starting creosote in the

20   stoves used by Imperial in Test 2 ranged from 440g to 1260g.  Kelly Decl. at ¶39 & Table 2.  In

21   comparison, the amount of starting creosote in the stoves used by CSL during its testing ranged from 1320g

22   to 2140g.  CSL Motion at 6.  Although the exact ranges are different, they share the characteristic that

23   there were large differences between the stoves with respect to how much starting creosote was in each;

24   for Imperial the maximal difference was 820g, while for CSL the maximal difference was 720g.  Thus,

25   despite CSL's carefully controlled protocol for accumulating creosote, large differences in starting creosote

26   were nonetheless observed.  Since CSL did not consider this variation to be a problem in its own

27   experiments, it cannot convincingly argue that Imperial was unreasonable in its failure to consider similar

28   variation a problem in its experiments.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    Similarly, CSL argues that the fire temperatures in the test stoves of Test 2 were consistently hotter

2    than the fire temperatures in the control stoves, thus accounting, at least in part, for the observed differences

3    in creosote gain/removal between the stoves.  Houck Reply Decl. at ¶¶ 23-24 & Table 3.  CSL fails to

4    clearly and convincingly show that Imperial was unreasonable in ignoring such variations.  The variations

5    that CSL points to seem small when one considers the difficulty of maintaining consistent fire temperatures

6    in four stoves.  For example, the temperatures in the two control stoves exceeded 1100°F for an average

7    of 4.5 minutes, while the temperatures in the two test stoves exceed 1100°F for an average of 17 minutes.

8    *Id.*  In comparison, during CSL's own tests, the temperatures of the control fires exceeded 405°F for an

9    average of 49 minutes, while the temperatures of the test fires exceeded 405°F for an average of 62.5

10   minutes.[10]  *Id.* at ¶¶ 81-82 & Table 6.  Thus CSL's own data illustrates the difficulty of precisely controlling

11   and matching the temperature profiles of several stoves.

12       CSL also argues that, given the difference in the results produced by Test 1 and Test 2 (the control

13   stoves in Test 2 gained creosote, while the control stoves in Test 1 lost creosote), Imperial must have

14   varied its testing protocol.  Although Imperial's Opposition and the Declarations of Mr. Nowlan and Mr.

15   Kelly suggest that the testing protocol did not vary between Tests 1 and 2, counsel for Imperial claimed at

16   the hearing on February 11, 2005, that the Test 2 fires were intentionally maintained at lower temperatures

17   relative to the Test 1 fires.  This claim of Imperial's counsel is supported by the record.  Dr. Houck's Reply

18   Declaration reveals that the chimney temperatures at the start of Test 2 were very cold, and that Imperial's

19   stoves were run at lower temperatures during Test 2 than during Test 1.  Houck Reply Decl. at ¶¶ 26, 32,

20   and *compare* Table 2 *with* Table 3.  Imperial's counsel argued that the use of lower fire temperatures

21   made it possible for Imperial to isolate the effect of the SUPERSWEEP Plus log on creosote removal from

22   the similar effect obtained by burning a hot fire alone.  Because this is a reasonable explanation for the

23   differences observed between Imperial's Test 1 and Test 2 results, to which CSL offers no counter

24

25

26   _____

27       [10]  The temperatures reported in Imperial's and CSL's tests are so different because (1) CSL burned
     its fires at lower temperatures than Imperial, and (2) Imperial measured the fire temperatures using an external
     chimney thermometer located 18" above the base of the chimney, while CSL measured the fire temperatures

28   using a internal flue thermometer locate 48" above the base of the chimney.

explanation, CSL has not shown by clear and convincing evidence that the discrepancies in Imperial's test results reveal fundamental inconsistencies in Imperial's testing procedures.

CSL also argues that the temperature data for Test 2 reveal "wild fluctuations" that would have been a shock to the chimneys and thereby contributed to creosote removal. Houck Reply Decl. at ¶¶ 30-31. Because CSL raises this concern only with regard to one of the control stoves, which gained creosote during the course of the test, CSL once again fails to provide clear and convincing evidence that Imperil's data from Test 2 is unreliable.

CSL further argues that the results of Test 2 are unreliable because Imperial's employees inaccurately measured the weights of two chimney sections from one of the test stoves. Houck Reply Decl. at ¶¶ 27-28. According to CSL, the mistakes led to an overestimate of the amount of creosote removed by the test fire. *Id.* CSL's arguments on this point are convincing. Nevertheless, CSL appears to have conducted a thorough review of Imperial's test data and found only a small number of mistakes. Furthermore, the stove in question experienced an apparent 48% reduction in creosote during the course of the test fire. While CSL convincingly argues that 48% is an over-estimate of the amount of creosote reduction that occurred in the test stove, CSL does not clearly and convincingly show that the chimney as a whole did not lose creosote.

Finally, CSL argues that one of the control stoves in Test 2 gained 360g of creosote during the treatment fire, an amount so large that the weight gain measurement is simply not credible. Houck Reply Decl. at ¶29. CSL fails to provide any information about the amount of creosote deposited in a chimney during a typical fire, and the extent to which the amount of creosote deposited can vary. Thus, it is impossible for the Court to reach any conclusion about whether or not 360g is an unbelievably large creosote deposit.

In sum, CSL's critique of Imperial's test results amounts to a showing that Imperial's employees made a few inaccurate measurements during the course of the tests. Although these inaccuracies call into doubt the validity of specific creosote gain/loss percentages reported by Imperial, they do not show by clear and convincing evidence that Imperial's test results, and the general conclusions that can be drawn from them, are unreliable.

CSL has failed to show by clear and convincing evidence that Imperial is in contempt of Paragraph 2 of the Injunction.[11]

### 2. CSL has failed to show by clear and convincing evidence that Imperial has failed to comply with Paragraph 1 of the Injunction

Paragraph 1 of the Injunction enjoins Imperial from making certain false representations. Unlike Paragraph 2, Paragraph 1 does not envision that Imperial make any "demonstration" to avoid contempt. Consequently, CSL bears the burden and must show by clear and convincing evidence that (1) Imperial has made a prohibited representation; and (2) that the representation is false. CSL has failed to meet this burden with regard to any of the six representations prohibited by Paragraph 1. CSL has not offered any admissible scientific testing on these representations. Even assuming that the test results offered by CSL were admissible, it has not carried its burden.

### a. CSL has failed to show by clear and convincing evidence that Imperial has failed to comply with Paragraph 1(a) of the Injunction

CSL claims that Imperial has failed to comply with Paragraph 1(a) of the Injunction by marketing its SUPERSWEEP Plus log in packaging that states that the log "helps reduce dangerous creosote in your chimney." To support its claim, CSL points to its own test results concerning the efficacy of the SUPERSWEEP Plus log, which purportedly show that Imperial's logs fail to remove chimney creosote. In addition, CSL argues that Imperial's test results relating to the efficacy of the SUPERSWEEP Plus logs are unreliable.

Paragraph 1(a) of the Injunction enjoins Imperial from falsely representing that the SUPERSWEEP Plus log "helps *eliminate* dangerous creosote in a chimney" (emphasis added). This representation differs from the one currently being used by Imperial in that the term "eliminate" has been replaced with the term "reduce." Thus, to prevail on this aspect of its contempt motion, CSL has to show by clear and convincing

---

[11]  CSL and Imperial disagreed about the meaning of the term "reduce" in Paragraph 2 of the Injunction. CSL claimed that Imperial needed to demonstrate that the SUPERSWEEP Plus logs could reduce creosote already present in the chimney, while Imperial claimed that it only needed to demonstrate that its logs reduce additional creosote accumulation. CSL Reply at 6. The Court concludes that reduction in the accumulation of creosote amounts to a reduction under the Injunction. In any event, Imperial's Test 2 results are sufficient to avoid contempt even if CSL's definition were applied.

United States District Court

For the Northern District of California

**United States District Court**

For the Northern District of California

evidence that: (1) consumers[12] consider the terms "eliminate" and "reduce" to be synonymous; and (2) Imperial's statement that the SUPERSWEEP Plus log "helps reduce dangerous creosote in your chimney" is false.

CSL has not introduced any evidence, let alone clear and convincing evidence, to show that "eliminate" and "reduce" mean the same thing to Imperial's potential customers.

As discussed above, CSL's own test results are not admissible to prove falsity under Rule 702 and *Daubert*. However, even if the Court were to consider CSL's test results, CSL has not carried its burden. Imperial has produced evidence demonstrating that the SUPERSWEEP Plus logs can eliminate pre-existing chimney creosote. CSL has failed to show by clear and convincing evidence that Imperial's test results are unreliable. Without being able to show that Imperial's test results are clearly unreliable, CSL cannot show that Imperial's representation that the SUPERSWEEP Plus log "helps reduce dangerous creosote in your chimney" is false.

CSL's tests alone are insufficient to demonstrate contempt of this Court's Order. Even taking CSL's test results at face value, the fact that CSL's tests yielded a different result than Imperial's does not amount to a clear and convincing showing that Imperial's representation is false. The fact that none of the sets of tests proffered by the parties is scientifically reliable within the meaning of Rule 702 makes it very difficult for the Court to say, by clear and convincing evidence, that one side's test prove that the other side's test results are in error. As described above, Imperial has a reasonable explanation for its methodology. No fatal errors have been shown in the procedures or results. Accordingly, the fact that equally unscientific tests by CSL – even if reasonable – reach different results cannot establish by clear and convincing evidence that Imperial's results are in error and the representation at issue is false.

CSL has thus failed, by clear and convincing evidence, to show that consumers consider the terms "eliminate" and "reduce" to be synonymous; and that Imperial's statement that the SUPERSWEEP Plus log "helps reduce dangerous creosote in your chimney" is false.

---

[12] The viewpoint of consumers is considered here because, if Imperial is making any false representations, it is consumers that make up the relevant marketplace who are the target of such representations. *See Kournikova v. Gen. Media Communications, Inc.*, 278 F. Supp. 2d 1111, 1117 (S.D. Cal. 2003) (finding that "[f]alse advertising claims generally involve some sort of misrepresentation in the marketplace that causes 'a discernable competitive injury.' [citations omitted]").

United States District Court

For the Northern District of California

   **b.**  **CSL has failed to show by clear and convincing evidence that Imperial has failed to comply with Paragraphs 1(b) of the Injunction**

  CSL claims that Imperial is in contempt of Paragraph 1(b) of the Injunction for falsely representing that the SUPERSWEEP Plus log "reduces the risk of chimney fires." As with Paragraph 1(a), CSL's evidence of Imperial's contempt consists of its own test results on the efficacy of the SUPERSWEEP Plus log and Dr. Houck's critique of Imperial's test results. Putting aside the fact that the Injunction enjoins Imperial from falsely representing that its SUPERSWEEP Plus fire log "helps prevent chimney fires," a representation which differs from the one on the actual packaging,[13] CSL has not shown by clear and convincing evidence that Imperial is in contempt of this sub-paragraph.

  As described above, CSL's own test results are not admissible, and in any event are not so convincing that the Court would conclude that Imperial's representation is false. Apart from its own tests, CSL's most salient evidence with regard to this representation is the testimony of Dr. Houck concerning Imperial's Test 1 results. In reviewing the temperature data for Test 1, Dr. Houck observed a temperature spike inside the chimney of one test chimney, which occurred during the time when a SUPERSWEEP Plus log was burning within the chimney. Dr. Houck considered the temperature spike as evidence of a chimney fire, and concluded that the "hot" fires used by Imperial during their testing procedures caused the chimney fire. Because the SUPERSWEEP Plus' packaging states that consumers should start a "hot" fire in their chimney before treating it with the SUPERSWEEP Plus log, Dr. Houck opined that Imperial's product creates a consumer safety problem by encouraging consumers to engage in behavior likely to lead to a chimney fire.

  Although Dr. Houck presents convincing testimony that a chimney fire occurred in one of the test stoves while Imperial was conducting Test 1, he does not provide clear and convincing evidence that Imperial's SUPERSWEEP Plus logs actually increase or fail to decrease the risk of chimney fires. As with all of the issues in this case, the resolution of this issue turns on the reliability of the evidence. Imperial's test results involved a total of only twelve stove fires, and only one chimney caught on fire. Because the number

---

  [13] Although the representation enjoined under Paragraph 1(b) of the Injunction differs from the representation actually used by Imperial, in this case it would be unreasonable for Imperial to believe that consumers would think that "reduces the risk of" and "helps prevent" have different meanings.

**United States District Court**

For the Northern District of California

1  of fires monitored by Imperial was so small, it is impossible to know whether the chimney fire occurred

2  randomly, by chance, or happened as the result of using Imperial's SUPERSWEEP Plus log according to

3  its packaging instructions.  This is especially true since the fire in the other test stove used during Test 1 was

4  hotter than the fire in the test stove which experienced a chimney fire.  *See* Houck Reply Decl. at ¶¶ 11, 19

5  & Table 2.  Consequently, CSL cannot show by clear and convincing evidence that Imperial's

6  representation that the SUPERSWEEP Plus log helps to reduce the risk of chimney fires is false.

7

8       Imperial's Test 2 results indicate that the SUPERSWEEP Plus log is capable of removing chimney

9  creosote.  According to Imperial's expert, Mr. Kelly, reducing chimney creosote reduces the risk of

10  chimney fires.  Kelly Decl. at ¶17.  CSL has failed to show by clear and convincing evidence that Imperial's

11  test results are unreliable.

12                   **c.      CSL has failed to show by clear and convincing evidence that
                              Imperial has failed to comply with Paragraph 1(c) of the Injunction**

13       CSL claims that Imperial is violating Paragraph 1(c) of the Injunction by falsely claiming that the

14  SUPERSWEEP Plus log "contains chemical compounds that act as combustion catalysts."[14]  Because CSL

15  cannot prove by clear and convincing evidence that Imperial's SUPERSWEEP Plus log does not contain

16  *any* chemicals that could act as a combustion catalyst to creosote, CSL has not established that Imperial is

17  in contempt with respect to this provision.

18       Imperial presents the testimony of Mr. Kelly and the scientific publications cited in his declaration as

19  evidence that the SUPERSWEEP Plus log contains chemical compounds that act as combustion catalysts.

20  According to Mr. Kelly, taken together Bulletin 360, the Traister book, the Ketrick and Wang publications,

21  and CSL's '365 patent demonstrate that chemicals present in Imperial's SUPERSWEEP Plus logs,

22  including sodium chloride, zinc, iron, and copper, can all act as combustion catalysts with respect to

23  creosote.

24

25

26

27       [14]  Again, this representation is slightly different from the one enjoined by the Injunction, but not in any way that is significant to the outcome of this contempt motion.  Paragraph 1(c) of the injunction enjoins Imperial

28  from falsely representing that its SUPERSWEEP Plus log "contains powdered combustion catalysts."

1    CSL's expert, Dr. Houck, disagrees, arguing at length that the publications cited by Mr. Kelly are

2   misleading because they: (1) relate to high-temperature processes involving the combustion of different

3   types of fuels; (2) lack credibility; and/or (3) suggest the use of chemical catalysts in amounts that exceed

4   those present in the SUPERSWEEP Plus log.  For example, Dr. Houck notes that the Traister book is an

5   unreliable reference because it was authored by a layman who, rather than being a chemist, wrote

6   do-it-yourself books.  Houck Reply Decl. at ¶¶ 52-54.  With regard to Bulletin 360, Dr. Houck observes

7   that it is concerned with the reduction of creosote produced by coal-burning stoves.  *Id.* at ¶36.  According

8   to Dr. Houck, because coal and wood are chemically different, the nature of coal creosote is different from

9   that of wood creosote and, consequently, a chemical process that catalyzes the reduction of coal creosote

10   "will not necessarily work on wood creosote."  *Id.*  at ¶38.  Likewise, Dr. Houck argues that the Ketrick

11   publication does not support Imperial's position because it relates to creosote emitted from industrial oil

12   and coal boilers which operate at much higher temperatures than a wood stove or fireplace; and he

13   distinguishes the Wang publication because it relates to the removal of soot from diesel engine exhaust,

14   which also occurs at extremely high temperatures. Id. at ¶¶ 57-58.  Finally, Dr. Houck notes that CSL's

15   '365 patent describes the use of copper and iron in amounts that exceed those present in the

16   SUPERSWEEP Plus log.  *Id.* at ¶60.

17    Although Dr. Houck carefully identifies many limitations of the publications cited by Mr. Kelly, he is

18   unable to show by clear and convincing evidence that Imperial's claim, that the chemicals present in the

19   SUPERSWEEP Plus log act as combustion catalysts, is false.  While he criticizes the sources used by Mr.

20   Kelly, he does not point to any established science which proves that the metals contained in Imperial's

21   product *do not* act as combustion catalysts.  It is CSL's burden to prove falsity, and it has not.

22    For example, as discussed above, Dr. Houck attempts to undermine the relevance of Bulletin 360

23   by pointing out that coal creosote and wood creosote have different chemical compositions, and thus,

24   combustion catalysts that act to reduce coal creosote will not necessarily catalyze the reduction of wood

25   creosote.  Dr. Houck's opinion on this matter clearly suffers from an insufficient factual basis.  Dr. Houck

26   provides no information concerning the molecular composition of coal and wood creosote, nor the

27   mechanisms by which combustion catalysts act upon either coal or wood creosote.  Given the absence of

28

United States District Court

For the Northern District of California

1   such information, it is equally possible that at least some of the combustion catalysts that act on coal

2   creosote have even greater activity with respect to wood creosote.[15]  Dr. Houck can point to no objective

3   evidence, such as scientific publications to support his opinion.  Furthermore, CSL's '365 Patent

4   contradicts Dr. Houck's opinion on this matter by teaching that some of the very same chemicals that act as

5   combustion catalysts with respect to coal creosote can also act as combustion catalysts with respect to

6   wood creosote.[16]

7        Likewise, Dr. Houck further suggests that wood fires are not hot enough to vaporize the chemical

8   catalysts in the SUPERSWEEP Plus log.  This testimony is again contradicted by CSL's '365 patent,

9   which indicates that at least some of the chemical catalysts in the SUPERSWEEP Plus log (specifically

10   copper and iron) can be used in wood burning stoves, which suggests that wood fires are able to vaporize

11   such metals so that they can be active in the reduction of wood creosote.

12        Dr. Houck also argues that the amount of chemical catalysts in the SUPERSWEEP Plus log are too

13   minimal to have a noticeable creosote reducing effect.  This testimony is offered without any support in the

14   literature.

15            **d.**       **CSL has failed to show by clear and convincing evidence that**

16                          **Imperial has failed to comply with Paragraphs 1(d) and 1(e) of the**
                           **Injunction**

17        CSL claims that Imperial is in contempt of Paragraphs 1(d) and 1(e) of the Injunction because it is

18   falsely representing that the SUPERSWEEP Plus log "can also help weaken, loosen, and break away some

19   of the hard, scaly or glazed deposits that may be difficult to remove by chimney brushing alone" and that

20

21

22

23 ───────────────

24       [15] In fact, Dr. Houck notes that coal-fired appliances collect less creosote than wood-fires stoves, and
   that the creosote that collects is of a more temperature resistant variety.  Houck Reply Decl. ¶39.  The fact that

25   wood creosote is less temperature resistant may render it more susceptible to the action of combustion
   catalysts.

26
       [16] It is not clear that a patent is objective and verifiable evidence that can be used to support the

27   testimony of an expert witness, since a patent does not go through a peer review process.  Nevertheless, CSL
   never contests the reliability of information presented in the '365 patent, and Dr. Houck tries to use the

28   teachings of the patent to refute Imperial's arguments.

United States District Court

For the Northern District of California

1  "the combustion catalysts help facilitate the burning of creosote and soot which can build up in chimneys."[17]

2  CSL has not provided clear and convincing evidence that these representations are false.

3      First, CSL's test results are inadmissible to prove the falsity of this representation, as discussed

4  above.  Morever, even if the testing by the parties were considered, Imperial is simply making

5  representations that follow from its representation that the log contains combustion catalysts and the results

6  of its tests.  Both of these representations describe properties that would be expected of a combustion

7  catalyst, and both representations are consistent with Imperial's test results.  Since CSL has failed to show

8  by clear and convincing evidence that the SUPERSWEEP Plus logs do not contain combustion catalysts

9  and that Imperial's test results are unreliable, it logically follows that CSL has failed to show by clear and

10  convincing evidence that these representations are false.

11      **e.**      **CSL has failed to show by clear and convincing evidence that Imperial has failed to comply with Paragraph 1(f) of the Injunction**

12      Paragraph 1(f) of the injunction enjoins Imperial from falsely representing that the SUPERSWEEP

13  Plus log is a "chimney cleaning log."  According to Imperial, a log that reduces the build-up of creosote in

14  chimneys necessarily results in some cleaning of the chimney.  CSL counters by arguing that simply reducing

15  the build-up of creosote does not amount to "cleaning."  Webster's Ninth New Collegiate Dictionary

16  defines the verb "clean" as "to rid of dirt, impurities, or extraneous matter" and "to remove or eradicate."

17  This definition is simply not consistent with the meaning that CSL applies to the term.  CSL has not meet its

18  burden by providing clear and convincing evidence that the SUPERSWEEP Plus logs do not remove

19  chimney creosote.

20  **IV.**    **CONCLUSION**

21      The Court does not know whether the SUPERSWEEP Plus does what it claims.  Neither party has

22  presented sufficiently reliable scientific evidence to allow the Court to reach a conclusion on that subject.

23  That question, however, is not before the Court: the only issue is whether Imperial violated the Injunction.

24

25  ───────────────

26      [17]  In both cases, the representations on Imperial's SUPERSWEEP Plus packaging differ from the enjoined representations.  According to the specific terms of the Injunction, Imperial is enjoined from falsely

27  stating that the SUPERSWEEP Plus log "aids in the loosening and breaking  away of hard, scaly or glazed creosote" and that it "lowers the combustion point of the creosote and soot deposits in a chimney flue by up

28  to 500˚F."

1    Imperial's tests, although not scientifically reliable, are sufficient to demonstrate that it is in compliance with

2    Paragraph 2 of the Injunction.  Similarly, CSL has failed to provide clear and convincing evidence that

3    Imperial made false claims about its product.  Accordingly, CSL's Motion for Finding of Contempt is

4    DENIED.

5          IT IS SO ORDERED.

6

7    Dated: April 29, 2005                 /s/ Joseph C. Spero

8                                     JOSEPH C. SPERO
                                     United States Magistrate Judge

9

10

**United States District Court**
For the Northern District of California